UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION (BISMARCK)

PAUL CRAIG COBB,
Plaintiff,

v.

SOUTHERN POVERTY LAW CENTER, INC.,
a/k/a SOUTHERN POVERTY LAW CENTER,
a/k/a SPLC;
HEIDI BEIRICH;
RANDOLPH DILLOWAY;
MORRIS DEES;
J. RICHARD COHEN;
RYAN LENZ,
Defendants.

Case No. 1:26-cv-354

COMPLAINT AND DEMAND FOR JURY TRIAL

1 Jurisdiction is invoked pursuant to the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964(c).

This Court possesses supplemental jurisdiction over the subsumed North Dakota civil rights and common-law tort claims pursuant to 28 U.S.C. § 1367, as reinforced by the Eighth Circuit continuing violation doctrine.

2 **U.S.C. SECTION 1964(c) AND THE COURT'S SUPPLEMENTAL JURISDICTION (28 U.S.C. SECTION 1367) OVER SUBSUMED NORTH DAKOTA CIVIL RIGHTS AND COMMON-LAW TORT CLAIMS REINFORCED BY THE EIGHTH CIRCUIT CONTINUING VIOLATION DOCTRINE**

3 COMES NOW the Plaintiff, Paul Craig Cobb, appearing pro se, and brings this Civil RICO action against the above-named Defendants, and respectfully alleges:

This Court has subject-matter jurisdiction pursuant to 28 U.S.C. Section 1331 and 18 U.S.C. Section 1964(c). Venue is proper under 28 U.S.C. Section 1391(b) as a substantial part of the operational actions and injuries manifest directly within the Bismarck Division of the District of North Dakota. The Plaintiff explicitly invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. Section 1367 to adjudicate accompanying North Dakota civil rights violations and deeply rooted common-law tort claims arising out of the same unified nucleus of operative facts, reinforced by the controlling Eighth Circuit continuing violation doctrine, which bridges all historical and concurrent extrajudicial overt acts into a single, timely, and actionable pattern of racketeering activity.

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NORTH DAKOTA**

**BISMARCK DIVISION**

---

**PLAINTIFF'S INITIAL AND SPECIALIZED COMPLAINT CLAUSE INSERTIONS UNDER FED. R. CIV. P. 15**

4 ¶ COUNT 1: **THE SABOTEURS' DILEMMA**; Defendants' manufactured infrastructural failures cannot shield them from **CIVIL RICO LIABILITY UNDER 18 U.S.C. SECTION 1964(c)**—Under established federal frameworks governing private civil remedies for the unlawful destruction of an individual's business or property, the law strictly forbids a tortious actor from invoking the very failures they engineered to escape liability.

5 ¶ COUNT 2: **CONSPIRACY TO DEPRIVE EQUAL PROTECTION UNDER 42 U.S.C. SECTION 1985(3)**; Defendants' deployment of coercive cartel-style tactics to systematically freeze the plaintiff out of localized energy commerce corridors and intentional fabrication of artificial public odium as a retroactive exculpatory reason for their covert and overt illegalities.

---

6 ¶ The predatory civil RICO scheme of interstate and cross-state wire fraud predicate acts tied to telephonic communications in violation of **18 U.S.C. Section 1343**, wherein the Defendants willfully transmitted fraudulent, false, and malicious narratives directly to industrial contractors and third-party commerce channels, intending to destroy engaged balances by conjuncting the fabricated claim that Plaintiff's physical recurrent employment presence "endangered" his fellow road workers, activating statutory civil retribution aligned to recognized penal exposures of up to twenty years in federal prison per count;

7 ¶ The explicit demand for compensatory, exemplary, and retributive damages under North Dakota tort frameworks and **North Dakota Century Code Section 32-03.2-11**, wherein statutory punitive damages inhered separately and automatically based upon the Defendants' fraudulent malice, oppression, and conspiratorial overreach conducted aggressively for twenty-three years across **five nations overall** (including the United States, Canada, and Europe); and

8 ¶ The conditional preservation and in-place contextual notice of the **dual and severable nature of this litigation** pursuant to federal civil procedure architecture, insulating the Plaintiff's long-standing state civil rights law pipelines and twenty-three year global common law tort claims against co-dependent procedural hurdles independently encountered by separable intents within the black-letter civil R.I.C.O. invocations.

9 Under 18 U.S.C. Section 1964(c), any person injured in his business or property by reason of a violation of Section 1962 is statutorily entitled to bring a civil action in an appropriate United States district court and shall recover threefold the damages he sustains, plus reasonable attorney's fees.

10 ¶. Plaintiff establishes that the Southern Poverty Law Center explicitly documented its corporate commendations and promotional materials regarding Heidi Beirich's operations in Leith, North Dakota, through highly coordinated internal and public relations actions. ... CONDUCT OVERSEEN BY DEFENDANT HEIDI BEIRICH, WHO STANDS INDICTED FOR WIRE FRAUD + MONEY LAUNDERING CONSPIRACY IN UNITED STATES V. SOUTHERN POVERTY LAW CENTER, INC. et. al., CASE NO. 2:26-cr-00139-ECM-KFP (M.D. AL.)

11 ¶. The Southern Poverty Law Center officially credited Heidi Beirich and her Intelligence Project staff with exposing Plaintiff's plans to create an enclave in Leith.

12 ¶. In internal updates to donors and public press releases, the corporate leadership lauded her division's hands-on investigative research for successfully tracking Plaintiff's property acquisitions since 2011 and breaking the story nationally.

13 ¶. This specific exposure was heavily utilized in SPLC fundraising drives as a prime example of their real-time monitoring effectiveness to generate unprecedented financial support.

14 ¶ THE NET WORTH OF THE SOUTHERN POVERTY LAW CENTER, INC IS $921,762,979. SO SAY THEIR PRO PUBLICA I.R.S. FILINGS (FROM THEIR FORM 990.

15 ¶ Plaintiff brings this civil action not merely to redress technical statutory infractions, but to confront an egregious, systemic pattern of unlawful conduct by Defendants that demands immediate judicial intervention and comprehensive remediation.

16 Plaintiff respectfully apprises the court this filing is a VERIFIED COMPLAINT FOR TREBLE DAMAGES, CIVIL RIGHTS RESTORATION, STATUTORY DAMAGES, EQUITABLE RESTITUTION, AND DISGORGEMENT PURSUANT TO THE FEDERAL CIVIL RICO ACT (18 U.S.C. SECTIONS 1961, 1962(c), 1962(d)), SEEKING MANDATORY TREBLE DAMAGES AND ATTORNEY FEES UNDER 18 U.S.C. SECTION 1964(c) AND THE COURT'S SUPPLEMENTAL JURISDICTION (28 U.S.C. SECTION 1367) OVER SUBSUMED NORTH DAKOTA CIVIL RIGHTS AND COMMON-LAW TORT CLAIMS REINFORCED BY THE EIGHTH CIRCUIT CONTINUING VIOLATION DOCTRINE VERIFIED COMPLAINT.

17 ¶ This Court's subject-matter jurisdiction is squarely invoked under 28 U.S.C. § 1331, as the core disputes animating this controversy arise directly from the Constitution and the laws of the United States, presenting a pristine federal question that cannot be evaded.

SPECIAL PROCEDURAL PRE-EMPTION MATRIX:
MANDATORY NOTICE OF EXOTICIZED TOLLING, CONCURRENT DUAL-TRIAL ADJUDICATION, AND ABSOLUTE STAY OPPOSITION

18 ¶ Instead of executing basic statutory duties to protect an American citizen's real property, these local law enforcement actors deliberately treat the Plaintiff as an outcast who was "therefore legitimately disenfranchised as a normal American with appertaining Constitutional rights".

19 ¶ Even when I made the point to both Bay and Foss (and Bay himself had committed me against my will to Jamestown, thus tending to "stage" or ensure that, while I was incapacitated, the flim flam could be run by F-39) and when I objected I had been in Jamestown State Hospital when the ab initio Power of Attorney was dreamed up by F-39 SPLC "agent" Randolph Dilloway and Stanley Edward Diggs-- even that fact didn't phase or cause pause to either Bay or Foss (or Harding and Dillion after them) to corrective investigatory Sheriff action—and many of these requests were in throughout most of 2014, especially after Plaintiff was released in the Spring of that year.

...AS EXPLICITLY CORROBORATED BY THE ACTIONS OF F-39 RANDOLPH DILLOWAY (PUBLICLY IDENTIFIED AS PAID INFORMANT "F-39" IN THE UNSEALED FEDERAL CRIMINAL CASE OF UNITED STATES V. SOUTHERN POVERTY LAW CENTER, INC. et. al, CASE NO. 2:26-cr-00139-ECM-KPF IN THE U.S. DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA WHO WAS ILLICITLY PAID TO CONCEAL OPERATIONAL DETAILS AS PART OF THE BROADER DONOR FRAUD CONSPIRACY.

20 ¶ These administrative actors seemed to delight in delivering that passive-aggressive news to the Plaintiff.

21 ¶ Furthermore, the enterprise's field asset operating under the deceptive operational alias "Field Source F-39" executed a calculated, ongoing campaign of malicious defamation per se by making obsessive, false, and repeated references asserting that the Plaintiff had been confined to both an asylum for the criminally insane and a hospital for the criminally insane.

22 ¶ These fraudulent fabrications were systematically disseminated by the defendants across state lines to third parties, law enforcement agencies, and commercial entities for the explicit purpose of destroying the Plaintiff's character, ruining his vocational reputation, and permanently defaming him from meaningful participation in American society.

23 ¶ The defendants deliberately used these false assertions of mental instability as a tactical shield to discredit the Plaintiff in advance, ensuring that any subsequent reports he made to law enforcement regarding their extortionate activities would be summarily dismissed.

24 ¶ This highly structured and malicious application of psychological warfare and character assassination directly served to protect the ongoing operations of the multi-state racketeering enterprise from public exposure.

25 ¶ Under the strict statutory text of Title 18 of the United States Code (U.S.C.), the "fruits of labor" doctrine treats individual estate thefts and subsequent corporate financing as a single, continuous racketeering mechanism under 18 U.S.C. § 1961(5), creating a framework where the initial illicit acts are legally bound to any organization that attempts to capitalize on them.

26 ¶ The generation of these illicit fruits relies entirely on federal crimes defined under 18 U.S.C. § 1961(1), which includes mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343) targeting estate property, establishing that the foundation of the pattern is built upon the structural, fraudulent deprivation of tangible assets and financial resources belonging directly to the Plaintiff.

27 ¶ When an individual executing these predicate acts is subsequently placed on a corporate payroll, the individual's illicit labor fuses directly with the enterprise under 18 U.S.C. § 1962(a) and 18 U.S.C. § 1962(c), legally transforming the corporate payroll into a mechanism for absorbing, shielding, and actively utilizing the momentum and materials stolen during the commission of the underlying fraud.

28 ¶ If an enterprise officially adds an individual to its payroll because of their demonstrable success in robbing or defrauding an estate, it completes an explicit, forward-facing conspiracy under 18 U.S.C. § 1962(d).

Structural physics underlying the destruction of the Alfred P. Murrah Federal Building: To this day, Dr. Pitcavage's close institutional allies, including the Southern Poverty Law Center, Inc., persistently engage in a coordinated effort to defame and undermine General Partin's professional reputation---lumping General Partin in with Ku Klux Klan personages. Mr. Pitcavage seems to feel certain he is much more qualified than General Partin to parse for the public the technical, scientific parameters of what actually occurred at the OKC Murrah building.

29 ¶ Simultaneously executing this multi-layered intelligence and profiling apparatus, Dr. Mark Pitcavage founded, curated, and operated the online repository known as 'Militia Watchdog' from 1995 through 2000, utilizing this specific vehicle to aggregate research, steer public narrative, and-- via information and belief, Plaintiff alleges-- interface directly and personally with the supervisory networks controlling SPLC asset F-39, Randolph Dilloway, and in some frequent cases, post on an online forum—VNNF— it being the very same racist board on which Southern Poverty Law Center, Inc.'s true, own F-39, Randolph Dilloway did pontificate and threaten. PLAINTIFF IS INFORMED, BELIEVES, AND ALLEGES DR. MARK PITCAVAGE, POSTING ONLINE ON V.N.N.F. AS "DONNIE IN OHIO"— ONCE STATED HE HAD BEEN IN THE KU KLUX KLAN

30 ¶ Plaintiff has never been in a militia, nor has Plaintiff ever applied to be in a militia.

Defendants covertly accelerated their defamatory disruptions not because the Plaintiff discovered compartmentalized data previously shielded from entire civic review, but because the Plaintiff's active public dissemination and real-time investigative reconstruction of said detailed logs threatened to re-broadcast their involvement in trans-border intelligence connections preceding the destruction of the Murrah Building, triggering an intensified extrajudicial blackball strategically deployed to shield the enterprise from internal archival exposure.

31 ¶ This systemic extortion does not exist in an isolated temporal vacuum; rather, it constitutes the domestic apex of an **ongoing and systematic multi-jurisdictional conspiracy operating as a continuous campaign**. Pursuant to the **CONTINUING VIOLATION DOCTRINE**, the statute of limitations is refreshed and preserved because Defendants' repetitive injuries remain conspicuously active and cumulative. Operating simultaneously under North Dakota tort frameworks and cross-border capital ecosystems, the **Southern Poverty Law Center (SPLC)** and **Heidi Beirich**, comprising the Defendants and their co-conspirators, engaged in chronic, repeated defamations and systematic malicious stalking spanning **FIVE NATIONS OVERALL**, specifically interfering with the Plaintiff's reputational and real property dispositions throughout the United States, Canada, and Europe. PLAINTIFF SEEKS HAGUE LETTERS FROM CANADA, UK, SWEDEN, FINLAND, AND ESTONIA.

If Randolph Dilloway was formally placed on the SPLC's official payroll prior to 2013, maintained on a clandestine "off-the-books" cash basis during his early campaigns, or retrospectively absorbed onto the formal payroll at a later date, the legal outcome under 18 U.S.C. § 1962(d) remains identical. If Defendant Dilloway was receiving off-the-books compensation or intermittent stipends during 2013 and 2014, the Enterprise actively funded and directed his standalone property-targeting mechanisms in real time. Alternatively, if the Defendants assert or falsify corporate records to claim that Dilloway's formal payroll adoption occurred after his 2013-2014 campaigns against Plaintiff, his subsequent formalized employment constitutes an explicit corporate ratification and retroactive adoption of his prior illicit expertise and investigative fruits. Under established Supreme Court conspiracy doctrine, an enterprise cannot accept, utilize, and financially reward the outputs of an operative's prior targeting campaigns without assuming full, retroactive liability for the entire conspiratorial timeline [Salinas v. United States, 522 U.S. 52, 64 (1997)].

32 DIGGS AND DILLOWAY produced the fabricated Power of Attorney instrument bearing the unauthorized signature of Stanley Edward Diggs, with himself (Dilloway) listed as the "witness" who never actually witnessed the signing. **[See Exhibit A]**

33 ¶ This extreme, bad-faith undervaluation of a pristine vehicle asset functions as an explicit mechanism to manipulate law enforcement records, shield a cross-border conversion from immediate investigator scrutiny, and establish a fraudulent administrative barrier to strip Plaintiff of his tangible business assets.

34 ¶ The Systemic Extinguishment of Federal Pension Assets: To maintain a permanent stream of illicit revenue at Plaintiff's direct expense, Defendant Randolph Dilloway expanded the scope of the fraudulent scheme to target Plaintiff's federal Social Security pension assets, which the Plaintiff had then recently become entitled to receive upon reaching the age of 62, and successfully registering.

35 ¶ This recurring diversion of federal benefit funds was executed through unauthorized administrative re-routing and fraudulent electronic documentation, intentionally cutting off Plaintiff's baseline logistical liquidity.

36 ¶ Specifically, Defendant Randolph Dilloway obtained personal, unauthorized possession of Plaintiff's Walmart debit card, which was the explicit financial instrument through which Plaintiff received his monthly federal Social Security earned retirement elderly pension.

37¶ When scaled to the federal level, these state-law violations serve as the underlying predicate acts—specifically **extortion and mail/wire fraud**—necessary to establish a broader, continuous pattern of racketeering activity under the Civil RICO statute, 18 U.S.C. § 1964(c). As articulated by the Supreme Court in H.J. Inc. v. Northwestern Bell Telephone Co., a plaintiff **satisfies the continuity element of a RICO claim by demonstrating that the alleged predicate acts are part of an ongoing, regular way of conducting business.** The rationale behind this standard ensures that systemic, institutional corruption—wherein public authority is repeatedly weaponized alongside private entities to strip citizens of their property—cannot evade federal intervention and its statutory mandate for treble damages (threefold capital remuneration) and attorney's fees through mere procedural cloaking.

38¶ EXHIBIT A: The certified Houma, Louisiana police statement executed by Randolph Dilloway (Designation F-39) establishes definitive, self-authenticating tolling and fraudulent concealment evidence under F.R.E. 902(4) and sworn testimony under F.R.E. 901(b)(1). Documenting Dilloway's physical possession of Plaintiff's vehicle and the theft of personal gold jewelry alongside $9,400 in APMEX bullion—corroborated by APMEX purchase receipts and Dilloway's own self-incriminating VNNF forum screenshots—destroys any defense.

39 They committed a malicious semantic fraud, intentionally tricking the public into believing these Plaintiffs were individuals of violence, when in reality, their only "crime" was exercising the very expressive liberties our Constitution explicitly guarantees.

CONCLUSION AND APPLICATION OF STATUTORY LAW

40 ¶ Ultimately, this was not an ordinary legal dispute, but a systemic effort by a multi-layered criminal enterprise to completely destroy whistleblowers. For daring to unearth these facts, these Plaintiffs were subjected to an illicit apparatus fueled by institutional fraud, fictitious corporate shell accounts, and weaponized bank entries. Rather than answering for their actions, the adversaries deployed a calculated strategy of severe and enduring malice to bury the truth. Their vicious campaign went far beyond a fair defense, functioning as an administrative execution designed to inflict total reputational ruin upon these individuals permanently.

41 ¶ BRYAN FAIR REPEATEDLY, BOLDLY LIES TO CONGRESS—PLAINTIFF INSTANTLY RECOGNIZED FAIR'S LIES, HAVING BEEN STALKED ABROAD WITH BEIRICH'S USUAL MALEVOLENT, MANIACAL, FELONIOUS INTENTIONS TO DO HARM BY THE SOUTHERN POVERTY LAW CENTER, INC. IN UK, CANADA, SWEDEN, FINLAND AND ESTONIA

42 The June 2026 Overt Acts of Fraudulent Concealment and Direct Congressional Deception: The live, open-ended operational continuity of this multi-decade trajectory is further substantiated by affirmative, fraudulent cover-up campaigns executed directly by the enterprise's highest executive officers before federal oversight bodies to insulate the conspiracy from statutory scrutiny. Specifically, during the formal under-oath congressional testimony of SPLC Interim President and CEO Bryan Fair before Representatives Harriet Hageman, Brandon Gill, and Chairman Jim Jordan on June 9, 2026, during a House

Judiciary Committee hearing titled "The Southern Poverty Law Center: Manufacturing Hate, Part II," President Fair generated demonstrably false, non-disclosed statements under a formal administrative veneer. During said sworn appearance, President Fair explicitly asserted to the Committee that the SPLC network engaged in no unauthorized international tracking, communications, or active operational campaigns designed to harass, disrupt, or complicate the lives of American citizens. Far from a detached administrative response, this deceptive appearance constitutes a live overt act executed in furtherance.

Demanding evidentiary threshold mandated by Federal Rule of Civil Procedure 65(b)(1)(A).

43 The underlying racketeering enterprise operates via a highly coordinated, multi-tiered hierarchy. The named Defendants—The Southern Poverty Law Center, Inc., Heidi Beirich, Morris Dees, J. Richard Cohen, and Ryan Lenz—function as the central administrative, journalistic, and financial command, operating in systemic concert with the Anti-Defamation League (ADL) and utilizing integrated 501(c)(3) tax-exempt corporate frameworks, including the Global Project Against Hate and Extremism (GPAHE), to mask operational funding and coordination. Operational proxies, cells, and specific operational actors—specifically including Lee Cook and Ryan Schock associated with Antifa (ruled a domestic terrorist organization on Sept. 22, 2025, by President Donald J. Trump )—serve as the physical enforcement mechanism. This conspiracy executes a systematic campaign of extrajudicial intimidation, continuous surveillance, and targeted menace calculated to result in imminent physical harm or a sudden, explicit abrogation of Constitutional Rights under color of law. The underlying racketeering enterprise executes these operations via integrated, tax-exempt 501(c)(3) corporate frameworks, specifically utilizing the Anti-Defamation League (EIN 13-1818723) to work with, which former relationship (enjoyed by ADL) with FBI was terminated by FBI director Kash Patel.

43a ¶ Plaintiff's investigative work explicitly exposed the suppressed historical record of ATF informant Carol Howe EX B EX C and compound EX D security chief Andreas Strassmeir, bringing to light structural inconsistencies in the official reporting that threatened the Defendant's institutional credibility; and this was the true and genuine reason Miss Beirich sought to squelch Plaintiff off the internet for life via manipulating Renton to do her will.

44 ¶ The stark reality of this selective institutional blockade is directly captured in the evidentiary record of this very case. As demonstrated by the historical files concerning attorney Jesse Trentadue regarding internal government knowledge, and the trial records detailing the roles of the ATF and FBI Handler Angela "Angie" Finley, the Plaintiff has engaged in deep, non-commercial historical and investigative research into the darkest corners of state-level concealment.

45 ¶ Plaintiff's public exposure of how an unpublicized SPLC informant apparatus operated within Elohim City prior to the 1995 explosion represents the exact *causa causans* (the immediate causing cause / foundational reason) for Plaintiff's placement on a permanent, corporate-managed targeting list.

46 ¶. The depth of the Enterprise's retaliatory animus becomes clear when one examines the specific historical disclosures Plaintiff spent over a decade investigative-reporting and bringing into the public domain. AS WELL AS THE 1996 FBI DIRECTOR LOUIS FREEH MEMO, IN WHICH IT IS MENTIONED SPLC HAD INFORMANT(S) AT ELOHIM CITY BEFORE THE BOMBING, PLAINTIFF HAS REPORTED ON DEES' 1980 DIVORCE RECORDS.

47 ¶. Plaintiff avers by information and belief, and thereupon alleges, that the Southern Poverty Law Center's targeted hostility toward Plaintiff was accelerated by Plaintiff's extensive journalistic exposure of the Oklahoma City bombing informant matrices.

48 **18 U.S.C. § 1343** — Standardizes standalone federal liability for each discrete telecommunications routing, data packet swipe, or electronic message traversing state borders in a scheme to defraud.

49 ¶. Specifically, Plaintiff's work focused heavily on the public record assertions and federal litigation of Attorney Jesse Trentadue regarding the precise operational role of Shawn Anthony Kenny, the high-liability asset who famously set up bank robber Kevin McCarthy and white supremacist Richard Lee Guthrie.

50 ¶. The anomaly of Shawn Anthony Kenny's operational treatment further illuminates the protective umbrella deployed over critical institutional assets, presenting a sequence of events that completely defies conventional reality but remains an unassailable matter of historical fact.

51 ¶. When testifying under oath in open federal court regarding the internal mechanics of the Aryan Republican Army, Shawn Anthony Kenny explicitly stated that he was an active, operational member of the bank robbery enterprise.

52 ¶. In said testimony, Kenny detailed the specific personnel involved in the group's underground funding operations.

53 ¶. Crucially for the record and the benefit of the reader, Kenny did not state or imply that Plaintiff was a member of the bank robbery cell.

54 ¶. His sworn testimony restricted the operational membership to himself and his immediate, indicted co-conspirators.

55 ¶. This absolute absence of any underlying criminal connection proves that the subsequent character assassination campaign launched against

56 ¶. By weaponizing these false associations inside the public domain, the Southern Poverty Law Center engineered a fraudulent pretext to justify their subsequent, localized campaign of physical and financial destruction.

57 ¶. The incorporation of Kenny's sworn trial admissions serves as a vital structural anchor in this pleading, providing the direct, empirical evidence,

58 **18 U.S.C. § 1962(d)** — Explicitly outlaws conspiracies to violate substantive racketeering provisions, making each participant liable for the foreseeable acts of the broader network.

59 ¶. Despite being absolutely known by the Federal Bureau of Investigation to have been an active, operational participant within the Aryan Republican Army and the notorious Midwest Bank Bandits robbery cell, Kenny was never subjected to the standard terminal indictments leveled against his immediate co-conspirators.

60 ¶. Instead, in a maneuver that flatly defies structural institutional reality, this known bank robber and domestic underground operative was permitted to seamlessly enlist and serve inside the United States Army.

61 ¶. For the benefit of the reader and the record, Plaintiff observes that such a radical departure from standard federal prosecutorial protocol can only be rationalized by the existence of a high-level operational intervention, heavily corroborating the findings of Attorney Jesse Trentadue regarding Kenny's protected status as a hidden institutional informant.

62 ¶. The integrity of the public record is preserved through the precise application of federal trial transcripts.

63 The Enterprise's tracking targets were entirely decoupled from Plaintiff's independent reporting lines.

64 ¶. By broadcasting that a core member of a federal bank robbery cell was granted absolute immunity and integrated into the military apparatus while suspected SPLC directors monitored the plot, Plaintiff exposed an institutional cross-contamination that the Enterprise spent decades harvesting donor capital to conceal.

65 ¶. To prevent an independent journalist from continuously broadcasting these verified trial records and audio exposures into the modern digital domain, the Enterprise shifted its strategy from public relations management to direct physical suppression, rendering the subsequent asset-stripping, extortion, and pension thefts across North Dakota a predictable and unified retaliatory protocol.

66 ¶. The extreme physical danger surrounding the exposure of these SPLC informant networks is further documented by the violent termination of key witnesses within this precise investigative matrix.

67 ¶. On January 6, 2025, former ATF undercover informant Carol Howe perished in a catastrophic house fire in Sparta, Tennessee, located approximately three hours and forty-five minutes from Plaintiff's current residence. SHE PASSED AWAY WHILE LIVING UNDER A PSEUDONYM, SARAH COLLINS.

68 ¶. The temporal and conspiratorial geometry of this institutional pattern expands exponentially when one uncovers the direct, targeted communications directed at Plaintiff's immediate operational network.

69 ¶. On March 19, 2022, and during preceding intervals, Inside Operative and Southern Poverty Law Center agent Randolph Dilloway transmitted a series of highly coercive private messages via the Vanguard News Network Forum platform directly to Plaintiff's personal associate and paralegal, Emily Elizabeth Henderson.

70 ¶. These electronic transmissions contained multiple, ominous references to a hitman, calculatingly suggesting that this hidden threat was mysteriously embedded within a specific circle of former Creativity members, explicitly naming Plaintiff, Will Williams, Henderson herself, or Defendant Dilloway himself.

In *Bridge v. Phoenix Bond & Indemnity Co.*, the Supreme Court unanimously ruled that a Civil RICO plaintiff asserting a pattern based on wire or mail fraud predicates does not need to show that the plaintiff personally relied on the defendant's deceptive transmissions.

71 Operating in tandem from a shared residence, Defendant Beirich and the apex F-9 extremist commander jointly managed and directed a proprietary financial and human resources apparatus under the designation of **"Turner Personnel."** Plaintiff was instantly shocked and electrified the very second he reviewed the unsealed Department of Justice superseding documentation, which laid bare the fact that "Turner Personnel" functioned as a fictitious shell account intentionally designated under a coded moniker derived from the extremist text *The Turner Diaries*.

72 Plaintiff explicitly alleges that the choice of this specific moniker was not a measure of passive concealment, but rather a deliberate, sociopathic calculation engineered by Beirich to **covertly boast of her extremist infrastructure,** ***project a terrifying reputational threat, and psychologically weaponize a lethal ideology to intimidate her targets into complete compliance.*** By utilizing this clandestine financial vehicle to simultaneously obscure conduits and project this calculated aura of intimidation to paralyze her marks, Defendant Beirich rendered her actions entirely detached from legitimate, non-profit programmatic goals—exposing a coordinated, coercive alliance with one of the most powerful and dangerous white supremacist figures in the United States.



73 ¶ PLAINTIFF WAS "PITCHED" BY F-9, MISS BEIRICH'S HOME PARTNER FOR OVER A DECADE, ON THE MAIN STREET OF MARINTON, POCAHONTAS COUNTY, W.V. DURING 2004, THE CHRISTMAS PARADE. F-9 WAS OBLIQUE IN HIS "JOB OFFER", LEAVING PLAINTIFF TO BELIEVE "RARE BOOKS" AND "TECH WRITERS" WERE PROBABLY WEALTHY SUPPORTERS OF THE NAT'L ALLIANCE. F-9'S FATHER WAS A MINISTER, HE HAS MASTER'S IN SCIENCE AND INITIALS "J.A.".

74 F-39 proffered Creativity religious material obtentions, personalized helps and and logistical assistance for Henderson to establish and lead her very own separate branch of the Creativity religion-- an ecclesiastical organization in which she had previously held active membership at 22 years of age At the time of these communications, she was approximately 38 or 39 years old.

(Cobb Aff. ¶ ).

75 ¶ During these public network communications, Southern Poverty Law Center "agent" Randolph Dilloway (F-39) additionally introduced, repeatedly utilized, and recalled having earlier proclaimed the term "hitman," an action that clearly actively frightened Ms. Henderson. Furthermore, Dilloway's contextual use of the term implied that the referenced assassin belonged to the The Creativity Movement (TCM)—a religious faction with which Dilloway, Will Williams, Ms. Henderson, and Plaintiff maintained concurrent or prior active affiliations—though Dilloway consistently resolutely refused to explicitly identify the person of the mysterious individuated silent hitman. (Cobb Aff. ¶ ).

76 ¶ On March 22, 2017, less than 72 hours after the final documented private communications between Southern Poverty Law Center "agent" Randolph Dilloway (F-39) and paralegal Ms. Emily Elizabeth Henderson, Plaintiff's facility,

¶. the HIS HISTORIC NORWEGIAN-HERITAGE CREATIVITY CHURCH, The Donald J.

77 Trump Church of Creativity of Rome in Nome, North Dakota. WAS ARSONED, AND BURNED TO THE GROUND IN 35MPH STEADY WINDS. The Supreme Court in *Bridge* established that as long as the enterprise's wire or mail fraud was the direct and proximate cause of the plaintiff's property injury, the statutory thresholds for federal recovery are met.

78 ¶. The physical execution of this institutional retaliation was carefully synchronized to maximize the probability of lethal impact.

79 ¶. Plaintiff had fully planned and intended to be physically present inside the structure on the exact date of the incident, as Nome, North Dakota is situated approximately 300 miles distant from Plaintiff's residence in Sherwood.

Under the *H.J. Inc.* framework, the relationship element is fully satisfied if the predicate acts share similar purposes, results, participants, victims, or methods of commission, or otherwise are interconnected by distinguishing characteristics.

80 ¶. However, due entirely to the grueling, cold driving conditions encountered in late March of 2017, Plaintiff changed his operational plans at the last moment, avoiding physical presence inside the sanctuary during its total, catastrophic arson.

Regarding Leith, ND and Nome, ND, local data and targeted profiles were directly weaponized to generate millions in donor contributions.

81 ¶ This critical distinction separates mere "malice in fact" and reputational insults from a true civil RICO injury under 18 U.S.C. § 1964(c), which strictly requires concrete harm to tangible "business or property," ensuring that when an enterprise uses defamatory content to drive its commercial or fundraising engines, the personal malice evolves into a property deprivation scheme.

82 ¶ Absent a concrete tie to property deprivation, independent acts of ongoing malice are legally severed from the underlying crimes, making the financial scope, revenue records, and internal wealth accumulation metrics of the corporate enterprise the vital legal battlefield for establishing federal racketeering continuity.

83 ¶ Plaintiff explicitly addresses the foundational scientific and statistical maxim that correlation does not imply causation—acknowledging that when distinct facts or historical happenstances cannot be isolated or tested under strict laboratory conditions, observers cannot definitively claim one event triggered another based solely on parallel timelines.

84 ¶ But if a court completely bars a litigant from openly considering, testing, or measuring highly obvious correlations, the court thereby symmetrically prevents the discovery of actual causality, locking the courtroom door against the truth.

85 ¶. Plaintiff avers by information and belief, and thereupon alleges, that Defendant Heidi Beirich—who operated as an intense, systematic follower of all Plaintiff's digital media and public broadcasts—harbored a profound, long-standing psychological fixation on this precise undercover archetype. Plaintiff maintains this psychological maladjustment in significant measure led to Beirich's cohabiting for a decade with F-9, though it didn't surpass her urge to bilk, scam and control, but rather, fed and fueled those.

86 ¶. Plaintiff avers by information and belief, and thereupon alleges, that before her institutional rise, and considering her documented, long-term cohabitation of approximately ten years or more sharing a home and banking instruments with the deep-cover extremist asset designated as F-9, Defendant Beirich actively harbored an internalized desire to live out a real-world manifestation of these Carol Howe-type undercover fantasies. From her perch and with advisory counsel from F-9 who knew Plaintiff, Heidi Beririch, the #2 personage in the multi-city officed SPLC, held forth upon Plaintiff's poverty, his limited Constitutional right to retain his properties under the circumstances, his racial pigment or non-pigment, his limited freedoms or rights to be left alone by herself and SPLC while traveling or living in other European nations in which he had ancestry.

87 ¶.. Plaintiff seeks full Discovery re these Dees SPLC matters, fully including the FBI Director Louis Freeh, Attorney Jesse Trentadue and Plaintiff Craig Cobb's early journalism on these matters, there being no end of certain statute of limitations.

88 ¶. Plaintiff will aggressively seek full, unmitigated discovery regarding these precise matters, as his deep reportage of the Trentadue FOIA Southern Poverty Law Center FBI Director Louis Freeh linkage is appertaining directly to the Entity's never-ceasing acrimony and dubious actions launched against this elderly plaintiff.

Under 18 U.S.C. Section 1512(b)(3), it is an independent federal crime to use harassment, intimidation, or deceptive statements to hinder, delay, or prevent any person from communicating information relating to the commission of a federal offense to a judge or law enforcement officer.

89 ¶. Plaintiff explicitly notes for the record that Defendant Morris Dees remained entrenched as a high, commanding Southern Poverty Law Center official during both the critical timeline of the Leith asset-stripping operations and the subsequent catastrophic Nome church arson.

90 ¶. His continuous executive oversight during these distinct operational phases confirms that the highest echelons of corporate governance within the

Enterprise were actively maintaining administrative command over the field operatives executing these localized extractions.

91 ¶. The Enterprise could not afford a public trial or a deep journalistic exposure that proved deep-cover federal and institutional assets were circulating inside an active domestic terror plot while a federal building was being internally rigged for destruction.

92 ¶. To prevent an independent journalist from broadcasting these synchronized written and audio exposures—compiled in tandem with parallel disclosures by Attorney Jesse Trentadue, constitutional attorney Kirk Lyons, and investigative journalist J.D. Cash—the Enterprise shifted its apparatus from public relations management to localized physical elimination.

Under 18 U.S.C. Section 1512(b)(3), it is an independent federal crime to use harassment, intimidation, or deceptive statements to hinder, delay, or prevent any person from communicating information relating to the commission of a federal offense to a judge or law enforcement officer.

93 ¶. This unyielding institutional malevolence and retaliatory intent constitutes the precise, self-authenticating motive that fueled the Enterprise's subsequent, multi-phased racketeering campaign across North Dakota, establishing the continuity, intent, and relationship required to sustain the Civil RICO pattern

94 ¶ The Enterprise, ostensibly with Grant county state's attorney Todd Schwarz, Grant county commissioner chair Alton Zenker, Leith Mayor Ryan Schock, Leith councilman Lee Cook, Sheriff Steve Bay (who by Plaintiff's information, belief and allegation committed an extortionate act by coming running from Grant county to Mercer county in his publicly owned police cruiser to "pick up" the second half or so of the deeds after the notary capable guards at Mercer jail had notarized the documents) … and Heidi Beirich and/or SPLC board member attorney Eldon Rosenthal, who'd handled a land "conversion" against Tom Metzger—all and which of these are to be fairly found out via Discovery by the Plaintiff, and Plaintiff does so ask this court now for same.

95 ¶ As a non-negotiable prerequisite to surviving a manufactured thirty year sentence, Plaintiff's very capable and honorable lawyer Ryan Heintz had informed Plaintiff "it" (i.e. such extortionately-leveraged conversions by legal definition) are in fact truly totally illegal, but it was the only way to get them (the Enterprise) to back off the ludicrous and monumentally felonious overcharging of the case.

96 ¶ Based on the legal arguments typically raised in cases involving civil rights, due process, and the rights of incarcerated individuals, there are four key legal frameworks and accompanying U.S. Supreme Court rulings that directly

govern whether and how a prisoner's property can be lawfully transferred or "converted."

The specific legal protections and precedent that dictate the exclusive conditions for such property transfers include:

The Due Process Clause (14th Amendment)

The Fourteenth Amendment **prohibits the government from depriving any person of "life, liberty, or property, without due process of law." This applies equally to prisoners.** Under this bedrock principle, property cannot be stripped from an inmate through coercion, unauthorized state action, or without an official, fair legal proceeding.

> **U.S. Supreme Court Ruling: *Parratt v. Taylor*, 451 U.S. 527 (1981)** and ***Hudson v. Palmer*, 468 U.S. 517 (1984)**. These cases establish that while random and unauthorized deprivations of a prisoner's property by state actors do not violate due process *if* a meaningful post-deprivation remedy (like a state court lawsuit) is available**, intentional and systemic deprivations without a formal legal framework remain strict constitutional violations.**

**Prohibition Against Extortion Under Color of Official Right (The Hobbs Act)**

The **Hobbs Act (18 U.S.C. § 1951)** is a federal law prohibiting extortion, defining it as obtaining property from another with their consent, but where that consent is induced by the "wrongful use of actual or threatened force, violence, or fear, or under color of official right." An official using their public position, vehicle, or authority to pressure an inmate into signing over deeds constitutes a federal crime, rendering the transfer legally void.

97 ¶ **U.S. Supreme Court Ruling: *Evans v. United States*, 504 U.S. 255 (1992)**. The Supreme Court ruled that an official violates the law by wrongfully taking property under color of official right simply by knowing that the payment or property transfer was offered in return for official acts or because of their official office, requiring no passive acceptance or overt physical force.

**Civil RICO / Racketeering Enterprise (18 U.S.C. § 1962)**

98 ¶ The **Racketeer Influenced and Corrupt Organizations (RICO) Act** makes it unlawful for any person employed by or associated with an "enterprise" to conduct its affairs through a pattern of racketeering activity—which explicitly includes federal extortion. If multiple public and private actors coordinate to illegally strip an inmate of land assets, it constitutes an illegal enterprise rather than a standard real estate transaction.

**U.S. Supreme Court Ruling: *Boyle v. United States*, 556 U.S. 938 (2009)**. The Court clarified that an association-in-fact enterprise under RICO requires three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.

**Unconstitutional Conditions & Coercive Voluntariness**

99 ¶ The **Doctrine of Unconstitutional Conditions** dictates that **the government cannot condition a benefit, a release**, or basic human safety on the requirement that a person surrender a constitutional right, such as their private property rights. **For an incarcerated person, a signature on a deed is only legally valid if it is entirely voluntary.** If a signature is obtained through implicit threats regarding jail conditions, prolonged detention, or unequal treatment, the contract is legally void *ab initio* (from the beginning) due to duress.

100 ¶ **U.S. Supreme Court Ruling: *Koontz v. St. Johns River Water Management District*, 570 U.S. 595 (2013)**. The Supreme Court reinforced that the government may not leverage its administrative or policing power to coerce individuals into giving up their private property, noting that such pressure infringes upon constitutional safeguards regardless of whether the coercion is successful.

**The Extrajudicial Nature of the Deeds**

101 ¶ While Cobb agreed to the *criminal* terms (probation in exchange for pleading guilty to a felony terrorizing and misdemeanor menacing), the transfer of the land deeds was handled ***outside the formal text of the court-sanctioned plea document.***

102 ¶ If this is being used to build an extortion or duress claim, the record shows that Judge Reich asked Cobb if he agreed to the *criminal convictions and probation.*

103 ¶ However, *because the physical* ***signing and surrender of some of the real estate deeds took place inside a jail cell prior to the final court order***, this Plaintiff's strategy typically argues that **the state used the *withholding of that court approval* as the ultimate leverage**—meaning **Cobb was forced to execute the real estate transactions in a coercive environment just to ensure the state would walk into Judge Reich's courtroom and recommend Plaintiff's release.**

Plaintiff asserts no reasonable party within the arranged structure quibbles with that true definition of what really happened.

104 ¶ **A prosecutor cannot simply trade "freedom for land" like a medieval warlord. Certainly not in advance of a backroom behind the scenes deal, i.e. "your freedom for your lands" … after you FIRST give us your "in a Mercer county jail cell signature on your land**

**deeds", we (albeit, totally illegally against United States Code) give you our gentlemen's word here and now you shall most certainly go free.**

106 ¶ May it please the Court.

We are not operating here within the bounds of a recognized, legitimate, or structurally sound criminal resolution. What the State euphemistically characterizes as a "global settlement" or a "voluntary divestment" is, in reality, a **farcical and flagrantly unlawful extraction of private property**, orchestrated under the heavy cloak of state authority. To call this a contract is to reduce the law to a parody; to call this due process is to abandon constitutional fidelity entirely.

106a PLAINTIFF STATES GRANT COUNTY FREQUENTLY FUNCTION WITH THE ENTERPRISE AS SUBORDINANTS.

107 ¶ Let us be unsparingly direct about the mechanics of this so-called transaction. While the Plaintiff sat isolated inside a jail cell, stripped of his autonomy, agents of the State—acting as a coordinated, extrajudicial enterprise—engineered a raw, medieval quid pro quo: *your freedom for your lands*.

108 ¶ The State's Attorney openly admitted to the press that stripping the Plaintiff of his real estate was a prerequisite to his liberty.

109 ¶ We have a Sheriff traveling across county lines in a publicly funded police cruiser, not to enforce the peace, but to act as a courier for extorted real estate deeds executed inside a prison house.

110 ¶ This is not the administration of justice. This is an official shakedown masquerading as a plea negotiation.

The Defense attempts to seek safe harbor under *Parratt v. Taylor* and *Hudson v. Palmer*, arguing that any alleged overreach was merely an isolated, "unauthorized" act remediable in some local civil court. That argument is legally bankrupt. The Supreme Court in *Parratt* never intended to shield a premeditated, institutional scheme.

111 ¶ This deprivation was not the random caprice of a rogue guard tossing a cell; it was a **systemic, policy-driven, and highly orchestrated extraction** involving the Mayor, the County Commissioner, and the chief law enforcement officer of the county. When the apparatus of the state is systematically deployed to compel the transfer of real property as a condition of release, *Parratt* is wholly inapplicable, and the Fourteenth Amendment's Due Process Clause is directly violated.

Furthermore, the Defense points to the sentencing colloquy, claiming that because Judge Reich asked the formal questions and the Plaintiff nodded along, the transaction was magically laundered. That is a dangerous legal fiction. The physical deeds were signed on February 28, 2014—weeks

The Extrajudicial Nature of the Deeds While Cobb agreed to the criminal terms (probation in exchange for pleading guilty to a felony terrorizing and misdemeanor menacing), the transfer of the land deeds was handled outside the formal text of the court-sanctioned plea document. If this is being used to build an extortion or duress claim, the record shows that Judge Reich asked Cobb if he agreed to the criminal convictions and probation. However, because the physical signing and surrender of some of the real estate deeds took place inside a jail cell prior to the final court order, this Plaintiff's strategy typically argues that the state used the withholding of that court approval as the ultimate leverage—meaning Cobb was forced to execute the real estate transactions in a coercive environment *just to ensure the state would walk into Judge Reich's courtroom and recommend Plaintiff's release*. Plaintiff asserts no reasonable party within the arranged structure quibbles with that true definition of what really happened. A prosecutor cannot simply trade "freedom for land" like a medieval warlord. Certainly not in advance of a backroom behind the scenes deal, i.e. "your freedom for your lands" … after you *FIRST* give us your "in a Mercer county jail cell signature on your land deeds", we (albeit, totally illegally against United States Code) give you our gentlemens' word here, and now you shall most certainly go free. Due to our magnanimity.

112 ¶ **MAY IT PLEASE THE COURT:**

What the defense unblushingly characterizes as a standard, text-bound plea negotiation is, in truth, an extrajudicial shakedown executed under the absolute color of official right. Let us strip away the sanitized procedural veneer: the state of North Dakota did not engage in the lawful administration of justice. Instead, state actors operated an illicit, coercive apparatus that leveraged the raw custody of a human being to extract real property. They traded freedom for land like medieval warlords, executing a transaction that is **patently absurd and flagrantly unlawful**.

To maintain that Mr. Cobb's formal, in-court colloquy before Judge Reich somehow cleanses this transaction is a farcical misdirection. The record is clear: the physical surrender of these real estate deeds did not occur under the sobering, transparent auspices of the judiciary. **It occurred weeks prior, in the coercive shadows of a Mercer County jail cell via a guard who was also a notary, and in a Grant county courthouse conference room about sixty days before Plaintiff was at last released** after having been massively overcharged. Plaintiff's hands were briefly uncuffed so he could sign.

113 ¶ The state used the ultimate leverage—*the literal withholding of their recommendation for a non-custodial sentence*—to force

an incarcerated man's signature onto property transfers **before they would ever agree to step into the courtroom**.

114 ¶ This is a textbook violation of the **Fourteenth Amendment's Due Process Clause** and the **Doctrine of Unconstitutional Conditions**. As the Supreme Court made clear in ***Koontz v. St. Johns River Water Management District*, 570 U.S. 595 (2013)**, *the government is strictly prohibited from leveraging its coercive administrative and policing powers to pressure individuals into surrendering their private property rights*. The coercion itself constitutes the constitutional infraction, regardless of whether the state attempts to wrap the final result in a seemingly consensual bow.

Furthermore, the defense's reliance on the *Parratt/Hudson* doctrine is completely misplaced.

115 ¶ This was not a "random and unauthorized" act by a rogue corrections officer under ***Parratt v. Taylor*, 451 U.S. 527 (1981)**. This was a pre-planned, coordinated, and institutionalized extraction. High-ranking municipal and county officials—including the State's Attorney, the Sheriff, and County Commissioners—utilized the systematic machinery of the state, including public police cruisers and jailhouse staff, to finalize a backroom, extrajudicial land grab.

115a ¶ When the state conditions a man's liberation upon the prior, off-the-record divestment of his earthly properties, it abandons the Rule of Law. This was an extraction born of absolute duress, conducted entirely outside the formal text of the court-sanctioned plea document. No amount of post-hoc rationalization can sanitize a transaction that was, from its inception, legally void *ab initio*.

115b ¶ HEIDI BEIRICH SENDS IN FUTURE PATRICIDAL HAMMER MURDERER, SEVERE SCHIZOPHRENIC AND FELON GLENN R. ARMSTRONG UPON PROBATIONARY CRAIG COBB WITH INSIDE GORY TIPS ABOUT WHAT HER FAVORITE, SOUTHERN POVERTY LAW CENTER, INC. HIGHLY-PAID, F-27 MICHAEL SCHLOER-LED SADISTIC SOULS-- PAID OVER $350,000-- ARE GOING TO DO TO HIM BECAUSE OF THEIR VIOLENT MALICE FOR HIRE: THE PLAINTIFF ASSERTS THAT DEFENDANT HEIDI BEIRICH'S SYSTEMIC SEARCH THROUGH RESTRICTED FEDERAL RECORDS OPERATED MUCH LIKE PROXIMO, THE CALCULATING GLADIATOR MERCHANT IN THE MOTION PICTURE GLADIATOR WHO SCOURED THE OUTER PROVINCES FOR FRACTURED, VIOLENT SOULS TO DEPLOY OINTO PERILOUS ARENAS.

The early spring twilight that year of 2014 was dying, bleeding its last, cold amber rays across the flat expanse of **Sherwood, North Dakota**, a solitary outpost of two hundred souls resting just two miles south of the Saskatchewan border. It was nearly **9:00 PM**, an hour when the biting northern wind carries a quiet, haunting isolation that settles deep into the soil.

116 At that exact moment, Plaintiff **Craig Cobb** stepped across his threshold, seeking the fleeting solace of the expiring sunset. The silence of the lane, however, was abruptly shattered by a looming silhouette approaching from the East.

Emerging from the gathering gloom was **Glenn R. Armstrong**, a man in his forties whose physical presence was as imposing as it was profoundly troubled. He was tall, husky, and radiated a dark, melancholic malice—a brooding despondency that seemed to poison the very air around him. Though a son of **Massachusetts**, with lesser, shifting anchors tied to the subtropics of **Florida**, he walked this remote North Dakota street like a spectral intruder, his sudden presence casting an immediate, threatening shadow over the plaintiff's evening.

117 Driven by a singular, unyielding purpose, the melancholic traveler had journeyed to this remote precipice for the sole purpose of confronting the Plaintiff. It was later revealed that he bore a message of paramount statutory and personal consequence—a dispatch of vital import that he was compelled to relay.

118 As the mercury plummeted and the dark, boreal night began to cloak the valley, the stark reality of their isolation became absolute: no commercial lodging existed within a seventy-mile radius of the municipality. Bound by the immutable dictates of basic human decency, and recognizing the imminent peril of the biting, nocturnal elements, the Plaintiff extended an invitation of refuge. With a gesture of cautious hospitality, he ushered Mr. Armstrong across his threshold, rescuing him from the bleak, encroaching chill of the North Dakota evening.

119 Though the Plaintiff harbored a profound, internal certainty that his own deep-seated grievances could never truly be consoled—doomed, perhaps, to a perpetual state of psychological and legal unrest—he nevertheless resolved to mirror his grim visitor. With the calculating poise of a seasoned strategist, he determined to match Mr. Armstrong's solemn demeanor, maintaining a strict parity of temperament so long as the dialogue remained tethered to the tenuous bounds of civility.

The tenuous veil of hospitality dissolved with a sudden, devastating pronouncement. By and by, the visitor bared his singular motive: he had deliberately sought out the recently paroled **Craig Cobb**. But the revelation that followed hung in the stagnant room like an unholy exhalation. With a jarring, mercurial shift in demeanor, the guest boasted that he had once concluded a five-

year penitentiary sentence for uttering an explicit, lethal threat against former President Bill Clinton. Though the Plaintiff would only uncover the truth over a decade later—discovering the carceral term was, in actuality, a lesser, twenty-one-month sentence—the immediate psychological impact was total and terrifying.

A cold, calculating panic seized the Plaintiff. By the unyielding, statutory terms of his own supervised release, any association with a known felon constituted a direct, fatal violation of his probation. The legal quicksand was shifting beneath his feet. He was trapped in an isolated domestic theater with a guest who was demonstrably, severely psychiatrically-imbalanced. Every procedural option carried catastrophic risk. To summon his parole officer was to invite immediate law enforcement scrutiny onto his own doorstep, risking a technical violation. Yet flight into the black North Dakota night was an impossibility; the man's physical imposition loomed large, and should the Plaintiff attempt to flee, he faced the imminent, harrowing probability of being overtaken by a desperate, unstable adversary.

120 These repeated statements served ro deliver direct proxy threats regarding impending physical harm from the Sadistic Souls Violent Bikers. While the intruder explicitly vocalized the ominous warnings of the Sadistic Souls Motorcycle Club, he retreated into a stubborn, evasive silence whenever pressed for details regarding his own dark network.

Armstrong adamantly refused to disclose how he had become acquainted with this macabre brotherhood—by what shadowy channels he knew them, or precisely why the Sadistic Souls had brought up the Plaintiff's name in their remote councils. That argument deliberately ignores the reality that this non-disclosure was structurally necessary to mask the pipeline connecting the enterprise to its paid enforcement arm—whether the Biggest Boss, Heidi Beirich or her chosen, princely Street Enforcer leading rider, F-27 Michael Schloer.

Plaintiff truly avers with certitude Heidi Beirich used her criminal database to sic Glenn R. Armstrong upon him, just as Plaintiff was starting what he wanted to be his successful probation—with her hope I would be summarily incarcerated for breaking probation, or even murdered by a totally insane man.

121 Less that three years later, he had murdered with a hammer---after all the mysterious talk he made how some unheard of Sadistic Souls Motorcycle Club hated Craig and were *really* going to get him. Recalling is like re-living all these events, so Plaintiff herein quits this true document.

122 ¶ CLOSING ARGUMENT AND MEDIATION MATRIX

FOR THE COURT

123 ¶ Let us conclude by addressing what the defense will invariably characterize as the sheer scale of this petition. They will urge this Court to view these figures with skepticism, attempting to frame the requested relief as an artifact of overzealous pleading. But that argument fundamentally misapprehends the structural architecture of our civil justice system.

124 ¶ The numbers before this Court are massive not because the Plaintiff is reaching, but because the Defendants' misconduct was immense. When a multi-million-dollar corporate enterprise and its agents systematically deploy targeted, defamatory interference to strip a citizen of their livelihood at Border States Paving, and simultaneously orchestrate a multi-decade racketeering pattern to crush a highly viable commercial development project just a mere 67 minutes down the legal 80 mile-per-hour corridor of Interstate 94, the law demands an equally massive corrective response.

125 ¶ Let us correct the record before the defense attempts to downplay the scope of the physical conversion. When the Defendants' enterprise dispatched their agents to strip the Plaintiff of his physical property—his gold and silver bullion, his personal gold jewelry, his Montblanc pen, and the irreplaceable

vintage heirloom wristwatch of his deceased father—they did not merely commit a simple petty-larceny infraction under state law. They engaged in an overt act of racketeering deployment designed to economically liquidate this individual.

126 ¶ Under the uncompromising mandate of 18 U.S.C. 1964(c), this Court possesses zero statutory discretion to treat these items as ordinary losses. Property stripped away under the banner of a RICO enterprise must be trebled. The base loss of $16,018.87 multiplies automatically to $48,056.61. To plead otherwise would be an abdication of the text of the statute.

127 ¶ Crucially, the Court must observe that this figure is baseline; it does not even incorporate the compounding market-value trebling of the physical bullion asset—an asset representing the literal accumulation of the Plaintiff's unique prescience, cultivated and earned through a lifetime of solitary, intense intellectual study. To evaluate this loss as a static, historical commodity value is to ignore the forward-looking economic trajectory of an asset preserved precisely because of long-range intellectual acumen.

128 ¶ The defense wants to sanitize this case. They want to separate the grand corporate interference from the raw, physical theft of a dead father's watch and a box of bullion. But it is all part of the same predatory continuum. Whether it is a multi-million-dollar land asset in Leith being strangled a mere 67

129 ¶ I, THE PLAINTIFF, PRO SE, hereby execute this comprehensive verification pursuant to the mandates of **28 U.S.C. Section 1746**, submitting under penalty of perjury that I have read the foregoing complaint and all insertions thereof, that I am thoroughly familiar with the content contained therein, and that the factual matrices, statutory invocations, and jurisprudential pipelines exposed within the Prayer for Relief and Factual Allegations are accurate, true, and correct to the best of my own independent knowledge, information, and sacrosanct belief.

**VERIFICATION OF PRAYER FOR RELIEF**

130 ¶ I hereby specifically verify, declare, and swear to the truth of the remedial demands set forth in the Prayer for Relief, including but not limited to:

131 ¶ The extortionate civil liability arisen under the **Hobbs Act, 18 U.S.C. Section 1951, and 42 U.S.C. Section 1982**, arising out of the coercive "your freedom for your lands" asset-stripping extortion scheme waged by the Defendants, **Heidi Beirich** and the **Southern Poverty Law Center (SPLC)**, which compelled the unlawful stripping, conversion, and deprivation of the Plaintiff's twelve real properties situated in Leith, North Dakota. I verify that said exclusionary and intimidatory maneuvers systematically subverted my sacrosanct real property disposition rights governing commerce, realization of ecosystem capital, and transfer;

cannot be legally shuffled, sheltered, or shunted outside the sovereign enforcement authority of the United States federal dockets.

132 ¶ Order that Defendant Southern Poverty Law Center, Inc. submit its primary electronic clearinghouse interfaces, automated clearing house (ACH) pipelines, and SWIFT/Fedwire communication blocks to real-time compliance tracking by a court-approved electronic auditor, thereby forcing the immediate disclosure of any outbound transactional wire sequences exceeding $10,000.00 to guarantee complete corporate compliance with the asset freeze and protect the court's jurisdiction from mid-litigation endowment drain.

133 ¶ Mandate that corporate defendant Southern Poverty Law Center, Inc., make application to federal authorities to support the issuance of a Financial Crimes Enforcement Network (FinCEN) Geographic Targeting Order (GTO), contractually binding all corporate treasury structures to file instant reporting declarations for any out-of-state or out-of-boundary liquidation movements to preserve the integrity of the frozen capital pools.

134 ¶ Enter a mandatory injunction ordering a comprehensive multi-state donor and capital attribution audit, legally compelling Defendants to produce clean ledger sheets verifying whether any out-of-state government subsidies, federal grant fundings, or public treasury endowments were illicitly blended into

135 ¶ The Sovereign Treasury Offset Program (STOP) Cross-Registration: Decree that the final judgment entered within this matter be formally cross-registered with the Bureau of the Fiscal Service under the Sovereign Treasury Offset Program, ensuring that any future federal contract payouts, surplus property allocations, or administrative tax refunds designated for the Southern Poverty Law Center, Inc. are automatically intercepted and routed to the court registry to satisfy the active damage matrix.

136 ¶ Order that the Court take mandatory judicial notice of the explicit factual findings, structural conspiracy counts, and unsealed grand jury metrics set forth within the August 2026 Second Superseding Indictment filed in *United States v. Southern Poverty Law Center, Inc., et al.* (Case No. 2:26-cr-00139, M.D. Ala.), which explicitly charges that the corporate defendant and co-conspirator Heidi L. **Beirich knowingly orchestrated** an **extensive scheme to "defraud the nonprofit's donors"** and execute transactions via **"completely fictitious entities"** utilizing **"fictitious business names"** and **"false** statements made to a federally insured bank" to mask the **illicit routing** of over $4.1 million in **tax-exempt capital**; let it be decreed that these **verified federal criminal charges**—coupled with the direct, **non-speculative factual predicates** of this action, wherein paid **informant** Randolph Dilloway **(F-39)** utilized multi-state automated teller machines (ATMs) **to unlawfully convert Plaintiff's Social Security allocations**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NORTH DAKOTA

BISMARCK DIVISION

137 ¶ PLAINTIFF'S COMPREHENSIVE AND EXACT SPECIFICATION OF DAMAGES AND FORMAL PRAYER FOR RELIEF

NOW COMES the Plaintiff, appearing pro se, and respectfully submits this judicially calibrated, meticulous specification of economic, statutory, and exemplary damages for inclusion within the formal record of this Honorable Court and for eventual presentment to the impaneled Jury. Plaintiff asserts that the quantitative paradigms enumerated herein represent non-speculative, liquidated baseline metrics calculated to an absolute arithmetical certainty, designed to satisfy the rigorous pleading standards of the Federal Rules of Civil Procedure and to secure appropriate pre-judgment and post-judgment remedies against the Defendants, jointly and severally.

138 ¶ THE LEITH REAL PROPERTY DEVELOPMENT OPPORTUNITY ANALYSIS

To establish the baseline of commercial reasonableness required by the Eighth Circuit, the commercial land development venture within the City of Leith, North Dakota, is scaled at a minimalist, low-density operational threshold of a mere 4.16

rooms per lot across Plaintiff's 12 fee-simple parcels. The geographic viability of this project is commercially premium, situated a mere 67 minutes from the industrial hub of Dickinson, North Dakota, utilizing Interstate 94 for the vast majority of the transit corridor at the state-mandated legal speed limit of 80 miles per hour. The subsequent analytical matrices isolate the gross revenue vectors across thirty years (representing exactly 360 calendar months of anticipated operational life) to afford the Court a comprehensive, dual-tiered perspective utilizing nominal rental price points of $1,000.00 and $500.00 respectively.

Projections Based on $1,000.00 Per Month Nominal Rental Value

| **Development Option** | **Rooms Per Lot (12 Lots Total)** | **Monthly Gross Revenue** | **Total 30-Year Revenue (Base Damages)** | **Civil RICO Trebled Award (18 U.S.C. 1964(c))** |
|---|---|---|---|---|
| 50-Room Configuration | 4.16 ROOMS PER LOT Rooms / 12 Lots TOTAL | $50,001.25 | $18,000,450.15 | $54,001,350.45 |

| | | | | |
|---|---|---|---|---|
| 100-Room Configuration | 8.33 ROOMS PER LOT Rooms / 12 Lots TOTAL | $100,002.50 | $36,000,900.30 | $108,002,700.90 |
| 150-Room Configuration | 12.50 ROOMS PER LOT Rooms / 12 Lots TOTAL | $150,003.75 | $54,001,350.45 | $162,004,051.35 |
| 200-Room Max Capacity | 16.66 ROOMS PER LOT Rooms / 12 Lots TOTAL | $200,005.12 | $72,001,800.60 | $216,005,401.80 |

Projections Based on Conservative $500.00 Per Month Nominal Rental Value

| Development Option | Rooms Per Lot (12 Lots Total) | Monthly Gross Revenue | Total 30-Year Revenue (Base Damages) | Civil RICO Trebled Award (18 U.S.C. 1964(c)) |
|---|---|---|---|---|
| 50-Room Configuration | 4.16 Rooms / Lot | $25,000.62 | $9,000,225.14 | $27,000,675.42 |

| Damage Categories & Itemizations | 50-Room Configuration | 100-Room Configuration | 150-Room Configuration | 200-Room Max Configuration |
|---|---|---|---|---|
| Pre-Judgment Asset Freeze Baseline | $30,857,162.86 | $30,857,162.86 | $30,857,162.86 | $30,857,162.86 |
| Border States Paving Wrongful Discharge | $876,432.18 | $876,432.18 | $876,432.18 | $876,432.18 |
| 20-Year Seasonal Wages (Trebled) | $59,119,234.56 | $59,119,234.56 | $59,119,234.56 | $59,119,234.56 |
| Stolen Property & Heirloom (Trebled) | $48,056.61 | $48,056.61 | $48,056.61 | $48,056.61 |

| | | | | |
|---|---|---|---|---|
| 100-Room Configuration | 8.33 Rooms / Lot | $50,001.25 | $18,000,450.28 | $54,001,350.84 |
| 150-Room Configuration | 12.50 Rooms / Lot | $75,001.87 | $27,000,675.42 | $81,002,012.26 |
| 200-Room Max Capacity | 16.66 Rooms / Lot | $100,002.50 | $36,000,900.56 | $108,002,701.68 |

139 ¶ MASTER SCENARIO INTEGRATION AND DAMAGE SUMMATION MATRIX

To facilitate precise replication and parsing when integrated directly into native word processing formats, the multi-layered ledger below consolidates the discrete vectors of economic deprivation, chattel conversion, and baseline pre-judgment attachments. This framework isolates each developmental capacity tranche to ensure absolute arithmetic fidelity before the Court.

Master Damages Matrix (All Options Calculated to Exact Dollar and Cent)

| | | | | |
|---|---|---|---|---|
| 2013 Toyota Corolla Conversion (Dilloway) | $24,850.43 | $24,850.43 | $24,850.43 | $24,850.43 |
| Man-Camp RICO Loss (At $1,000 Rate) | $54,001,350.45 | $108,002,700.90 | $162,004,051.35 | $216,005,401.80 |
| TOTAL CLAIMS DEMANDE D9454 | $144,927,087.09 | $198,928,437.54 | $252,929,787.99 | $306,931,138.44 |

140 ¶ CONTEXTUALIZED LEGAL SPECIFICATION OF COMPENSATORY AND PUNITIVE REMEDIES

To prevent the assertion of defenses rooted in the doctrines governing double recovery, Plaintiff explicitly structures the requests for relief below under the principles of alternative pleading, reserving the right to seek a post-verdict election of remedies that captures the maximum lawful pecuniary redress.

141 ¶ The core component of the immediate baseline attachment order—settling at precisely $30,857,162.86—constitutes the unmultiplied, liquid anchor of actual loss plus accrued interjurisdictional interest, serving as a protective barrier against the imminent threat of asset dissipation via Defendants' offshore conduits.

142 ¶ The tortious interference resulting in the severance of Plaintiff's economic relationship with Border States Paving is directly attributable to the fraudulent, malicious interventions of Heidi Beirich, whose defamatory machinations falsely imputed an existential threat to the job site. This state-law claim stands independently of the racketeering allegations, carrying an autonomous punitive ceiling under NDCC 32-03.2-11 capped at double the base compensatory amount, yielding an isolated exemplary potential of $1,752,864.36 to address the SPLC's targeted oppression.

143 ¶ FORMAL PRAYER FOR RELIEF

144 ¶ WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in their favor and against Defendants, including the Southern Poverty Law Center and their named operational agents, co-conspirators, and cross-state actors, including Randolph Dilloway, granting the following specific, itemized relief:

145 ¶ Issuing Pre-Judgment Writs and Attachment Orders: Enter a preliminary injunction and asset freeze instantly pinning and securing the liquid bank accounts, corporate deposits, and real properties of the Defendants in the definitive baseline sum of $30,857,162.86 to preserve the status quo and prevent the further fraudulent dispersal or overseas sequestration of assets pending trial;

146 ¶ Judgment on Civil RICO Counter-Racketeering Claims: Award statutory treble damages pursuant to 18 U.S.C. 1964(c) for the systematic, multi-state destruction of Plaintiff's 30-year commercial land venture in Leith, North Dakota, in the exact sum of $216,005,401.80 based on the maximum capacity threshold, or alternatively, within the precise tiers set forth under the structural tables of this pleading;

147 ¶ Judgment for Unpaid & Seasonal Overtime Compensation: Award unpaid seasonal regular and overtime wages spanning twenty consecutive terms of employment, calculated and trebled under governing statutory wage protections to the exact amount of $59,119,234.56;

148 ¶ Judgment for Discriminatory & Unlawful Termination: Award actual economic damages, back pay, front pay, and fringe benefit restorations arising from the unlawful, maliciously induced termination perpetrated by Border States Paving in the exact amount of $876,432.18;




DEFENDANT
J. RICHARD
COHEN



DEFENDANT
RANDOLPH
DILLOWAY

DEFENDANT F-39 RANDOLPH DILLOWAY ↓ 60



youtube.com/watch?v=VwKevRl050A

YouTube

RANDOLPH DILLOWAY




**Randolph cuffed on the ground**

DEFENDANT 61
F-39 RANDOLPH DILLOWAY

robert ferguson
2 subscribers

Subscribe

151d

0

Share



DEFENDANT HEIDI BEIRICH



DEFENDANT RYAN LENZ

64




DEFENDANT MORRIS DEES

15 h

**Statutory Declaration Block**

"I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 9 day of OCT., 2026."

[ Paul Craig Cobb ]

PAUL CRAIG COBB, PRO SE LITIGANT

1310 Eastside Centre Court
Suite 6, Box 356
Mountain Home, AR 72653
870-706-1361